ROCKFORD LIFE INSURANCE CO. *v.* ILLINOIS
DEPARTMENT OF REVENUE ET AL.

No. 86–251.   Argued March 31, 1987—Decided June 8, 1987

STEVENS, J., delivered the opinion for a unanimous Court.

*Erwin N. Griswold* argued the cause for appellant.   With
him on the briefs were *Karl L. Kellar, Ira L. Burleson,* and
*John C. McCarthy.*

*Patricia Rosen*, Assistant Attorney General of Illinois, argued the cause for appellees. With her on the brief for appellees Illinois Department of Revenue et al. were *Neil F. Hartigan*, Attorney General, and *Roma Jones Stewart*, Solicitor General. *Charles J. Prorok* filed a brief for appellee Aurand.*

JUSTICE STEVENS delivered the opinion of the Court.

This case involves financial instruments commonly known as "Ginnie Maes." These instruments are issued by private financial institutions, which are obliged to make timely payment of the principal and interest as set forth in the certificates. The Government National Mortgage Association (GNMA) guarantees that the payments will be made as scheduled. The question presented today is whether these instruments are exempt from state taxation under the constitutional principle of intergovernmental tax immunity, or under the relevant immunity statute.[1]

---

*Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Fried, Assistant Attorney General Olsen, Alan I. Horowitz, Michael L. Paup,* and *Ernest J. Brown;* for the National Governor's Association et al. by *Benna Ruth Solomon, Beate Bloch,* and *Alan S. Madans;* and for the California Franchise Tax Board by *Benjamin F. Miller* and *Anna Jovanovich.*

[1] At the time relevant to this case, that statute was Rev. Stat. § 3701, as amended, and provided:

"Except as otherwise provided by law, all stocks, bonds, Treasury notes, and other obligations of the United States, shall be exempt from taxation by or under State or municipal or local authority. This exemption extends to every form of taxation that would require that either the obligations or the interest thereon, or both, be considered, directly or indirectly, in the computation of the tax, except nondiscriminatory franchise or other non-property taxes in lieu thereof imposed on corporations and except estate taxes or inheritance taxes." 31 U. S. C. § 742 (1976 ed.).

The 1982 reformulation of the statute was "without substantive change" see Pub. L. 97–258, § 4(a), 96 Stat. 1067, and now appears at 31 U. S. C. § 3124(a) with some minor variations in its language, which are not relevant to this case. As in *First National Bank of Atlanta* v. *Bartow County Tax Assessors*, 470 U. S. 583 (1985), the tax at issue here was levied prior to

Prior to 1979 changes in Illinois' tax law, Rockford Life Insurance Company (Rockford) paid an annual property tax on the assessed value of its capital stock. In 1978, the Illinois taxing authorities included the value of Rockford's portfolio of Ginnie Maes in their calculation of the corporation's net assets. Rockford challenged the assessment in the Illinois courts and the County Treasurer filed an action to collect the full amount of the assessment ($723,053.70). The Illinois courts uniformly rejected Rockford's contention that the securities were exempt from state property taxes,[2] reasoning that "the securities in question here were not 'other obligations of the United States' within the meaning of § 3701," and that the constitutional and statutory inquiries were identical in this case. 112 Ill. 2d 174, 176–184, 492 N. E. 2d 1278, 1279–1283 (1986). We noted probable jurisdiction,[3] 479 U. S. 947 (1986), and now affirm.

## I

The instruments involved here are standard securities bearing the title "Mortgage Backed Certificate Guaranteed by Government National Mortgage Association." App. 56.

---

the recodification, and "the pre-1982 form of the statute technically controls this case." *Id.*, at 585, n. 1.

[2] Appellant's state-court action also involved a variety of state-law claims, and claims that some other federally guaranteed securities were exempt from state taxation. See 112 Ill. 2d 174, 177, 185–187, 492 N. E. 2d 1278, 1279, 1283–1284 (1986). These claims are not at issue here.

[3] The issue presented is not the type that would usually merit our attention if presented in a petition for certiorari. The issue has divided neither the federal courts of appeals nor the state courts. Indeed, aside from the Illinois courts, no court has ever considered whether Ginnie Maes are exempt from state taxes. Nor does it appear that this case presents an overly important question of federal law "which has not been, but should be, settled by this Court." This Court's Rule 17.1(c). The fact is that the Illinois property tax imposed here was repealed in 1979. Nonetheless, this case arises under our mandatory jurisdiction, 28 U. S. C. § 1257(2), and Congress has not allowed us to consider these factors in deciding whether to rule on this case on its merits.

True to that title, the instruments contain a provision in which GNMA pledges the "full faith and credit of the United States" to secure the timely payment of the interest and principal set forth in the instrument. The purpose of the guarantee, and the function of GNMA, which is a wholly owned government corporation within the Department of Housing and Urban Development, is to attract investors into the mortgage market by minimizing the risk of loss.[4] See 12 U. S. C. § 1716(a). There is uncontradicted evidence in the record supporting the conclusion that GNMA's guarantee is responsible for the ready marketability of these securities. That guarantee is not the primary obligation described in the instrument, however. The duty to make monthly payments of principal and interest to the investors falls squarely on the issuer of the certificate.[5]

---

[4] "The Mortgage-Backed Securities Program provides a means for channeling funds from the Nation's securities markets into the housing market. The U. S. Government full faith and credit guaranty of securities makes them widely accepted in those sectors of the capital markets that otherwise would not be likely to supply funds to the mortgage market. The funds raised through the securities issued are used to make residential and other mortgage loans. Through this process, the program serves to increase the overall supply of credit available for housing and helps to assure that this credit is available at reasonable interest rates." Dept. of Housing and Urban Development, Handbook GNMA 5500.1 Rev. 6, GNMA I Mortgage Backed Securities Guide 1–1 (1984) (hereinafter GNMA Guide).

[5] The promises set forth in the representative GNMA certificate in the record read as follow:

"THE ISSUER, NAMED BELOW, PROMISES TO PAY TO THE ORDER OF:

"ROCKFORD LIFE INSURANCE COMPANY

"36 1695690 F

"(HEREINAFTER CALLED THE HOLDER) The sum of $1,018,717 DOLS 20 CTS in principal amount, together with interest thereon and on portions thereof outstanding from time to time at the fixed rate set forth hereon, such payment to be in monthly installments, adjustable as set forth below. All monthly installments shall be for application first to interest at such fixed rate and then in reduction of principal balance then outstanding,

The issuer of the certificate is a private party, generally a financial institution, that posesses a pool of federally guaranteed mortgages.[6] Those individual mortgages are the product of transactions between individual borrowers and private lending institutions. It is this pool of private obligations that provides the source of funds, as well as the primary security, for the principal and interest that the issuer promises to pay to the order of the holder of the instrument. After a pool of qualified mortgages is assembled by a qualified issuer, the issuer enters into an agreement with GNMA authorizing the issuer to sell one or more certificates, each of which is proportionately based on and backed by all the mortgages in the designated pool, and each of which is also guaranteed by GNMA. The issuer thereafter may sell the "mortgage-backed certificates" to holders such as Rockford. The issuer administers the pool by collecting principal and interest from

---

and shall continue until payment in full of the principal amount, and of all interest accruing thereon.

.     .     .     .     .

"[T]he issuer shall pay to the holder, whether or not collected by the issuer, and shall remit as set forth below, monthly payments of not less than the amounts of principal being due monthly on the mortgages and apportioned to the holder by reason of the aforesaid base and backing, together with any apportioned prepayments or other early recoveries of principal and interest at the fixed rate." App. 56–57.

Sample certificates are published in the GNMA Guide, at App. 39–43.

The Ginnie Maes held by Rockford, are "modified pass-through securities" that provide for the payment of specific amounts whether or not timely collections are made from the individual mortgagors in the pool. See 128 Ill. App. 3d 302, 313, 470 N. E. 2d 596, 603 (2d Dist. 1984). GNMA also guarantees "straight pass-through securities" which provide that the issuer shall pay the holders of the securities the amounts collected from the pool, "as collected," less specified administrative costs. See 24 CFR § 390.5(a) (1986); GNMA Guide, at 1–1.

[6] The issuer must satisfy various financial requirements imposed by the Federal Housing Authority (FHA) and GNMA. See 24 CFR § 390.3 (1986). In addition each of the individual mortgages in the pool must be guaranteed by the FHA, the Veterans Administration, or another Government agency. *Ibid.*

the individual mortgagors and remitting the amounts specified in the certificates to the holders. GNMA's costs for the regulatory duties is covered by a fee charged to the issuer. Unless the issuer defaults in its payments to the holder of a certificate, no federal funds are used in connection with the issuance and sale of these securities, the administration of the pool of mortgages, or the payments of principal and interest set forth in the certificates.

Under the type of Ginnie Maes involved in this case, see n. 5, *supra*, the issuer is required to continue to make payments to the holders even if an individual mortgage in the pool becomes delinquent. In such event, the issuer may pursue its remedies against the individual mortgagor, or the guarantor of the mortgage, but the issuer does not have any rights against GNMA. GNMA's guarantee is implicated only if the issuer fails to meet its obligations to the holders under the certificates. In that event the holder proceeds directly against GNMA, and not against the issuer. But the risk of actual loss to GNMA is minimal because its guarantee is secured not only by the individual mortgages in the pool but also by the separate guarantee of each of those mortgages, and by a fidelity bond which the issuer is required to post. See 24 CFR § 390.1 (1986).

## II

The GNMA guarantee of payment that is contained in the mortgage-backed certificates held by Rockford is a pledge of the "full faith and credit of the United States."[7] But that does not mean that it is the type of "obligation" of the United States which is subject to exemption under the Constitution or the immunity statute. Because the statutory immunity

---

[7] GNMA is authorized to make this guarantee under 12 U. S. C. § 1721(g). The fact that the guarantee is executed by a federal agency, rather than by the United States itself, does not avoid the application of the immunity doctrine and statute. See *Memphis Bank & Trust* v. *Garner*, 459 U. S. 392, 396 (1983).

provision now codified at 31 U. S. C. § 3124(a) is "principally a restatement of the constitutional rule," see *Memphis Bank & Trust Co.* v. *Garner,* 459 U. S. 392, 397 (1983), we shall first decide whether the statute requires that Ginnie Maes be exempted from state property taxes, and then consider whether the constitutional doctrine of intergovernmental tax immunity requires any broader exemption.

At the time relevant to this case,[8] Rev. Stat. § 3701, as amended, 31 U. S. C. § 742 (1976 ed.), provided that "all stocks, bonds, Treasury notes, *and other obligations of the United States,* shall be exempt from taxation by or under State or municipal or local authority" (emphasis added). The full text of the sentence in which these words appear, rules of statutory construction, and the earlier legislation that was codified by the enactment of this statute, are all consistent with the conclusion that the phrase "other obligations" refers "only to obligations or securities of the same type as those specifically enumerated." *Smith* v. *Davis,* 323 U. S. 111, 117 (1944). This longstanding interpretation resolves the statutory question before us. GNMA certificates are fundamentally different from the securities specifically named in the statute. Most significantly, they are neither direct nor certain obligations of the United States. As the certificate provides, it is the issuer that bears the primary obligation to make timely payments—the United States' obligation is secondary and contingent.[9] In short, the United States is the

---

[8] See n. 1, *supra.*

[9] Appellant contends that the issuer is not an obligor at all because the certificate provides that the holder's sole recourse is against the GNMA. We disagree. That GNMA is willing to pay the investor in case of default and then pursue its own remedies against the issuer does not detract from the reality that the primary obligor is in fact the issuer, and not the GNMA. While the holder of the certificate may not enforce the obligation through a direct action against the issuer, GNMA may, upon default, institute a claim against the issuer's fidelity bond or extinguish the issuer's interest in the underlying mortgages thereby making the mortgages the absolute property of GNMA "subject only to unsatisfied rights therein of

guarantor—not the obligor. This distinction is more than adequate to support our conclusion that Ginnie Maes do not qualify as "other obligations of the United States" for the purposes of this statute.

Nor does the constitutional doctrine of intergovernmental tax immunity exempt these instruments from state property taxes. In *Smith* v. *Davis, supra,* the United States owed money to a construction company for work that the company had performed on open account. In computing its assets for state tax purposes, the company sought to exclude the amount owed to it by the Federal Government, but a unanimous Court held that the debt was not exempt. The Court concluded that "a unilateral, unliquidated creditor's claim, which by itself does not bind the United States and which in no way increases or affects the public debt, cannot be said to be a credit instrumentality of the United States for the purposes of tax immunity," 323 U. S., at 114, and went on to explain that the claim differed

> "vitally from the type of credit instrumentalities which this Court in the past has recognized as constitutionally exempt from state and local taxation. Such instrumentalities in each instance have been characterized by (1) written documents, (2) the bearing of interest, (3) a binding promise by the United States to pay specified sums at specified dates and (4) specific Congressional authori-

the holders of the securities." 24 CFR § 390.15(b) (1986); see also 12 U. S. C. § 1721(g); *New York Guardian Mortgagee Corp.* v. *Cleland,* 473 F. Supp. 409, 411 (SDNY 1979). As the GNMA Guide provides: An "issuer of GNMA-guaranteed mortgage-backed securities is responsible for . . . making the full and timely payment of all amounts due to securities holders." GNMA Guide, at 2–1. This statement is supported by the regulations which prohibit GNMA from guaranteeing securities "if the pool arrangement proposed by the issuer does not satisfactorily provide for . . . [t]imely payment of principal and interest, in accordance with the terms of the guaranteed securities." 24 CFR § 390.9(c) (1986). See also GNMA Guide, at App. 19, § 4.01 (issuer's contractual agreement with GNMA binds issuer to "remit to the holders all payments . . . in a timely manner").

zation, which also pledged the full faith and credit of the United States in support of the promise to pay." *Id.*, at 114–115.

With respect to Ginnie Maes, the third element described in *Smith* v. *Davis* is clearly lacking, and its absence is critical in view of the purposes behind the intergovernmental tax immunity doctrine. That doctrine is based on the proposition that the borrowing power is an essential aspect of the Federal Government's authority and, just as the Supremacy Clause bars the States from directly taxing federal property, it also bars the States from taxing federal obligations in a manner which has an adverse effect on the United States' borrowing ability. See *Weston* v. *City Council of Charleston*, 2 Pet. 449 (1829); *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819). The lack of a fixed and certain obligation by the United States in the Ginnie Mae context makes this concern far too attenuated to support constitutional immunity.[10] Cf. *Willcuts* v. *Bunn*, 282 U. S. 216, 225 (1931); *Hibernia Sav-*

---

[10] "But when effort is made, as is the case here, to establish the unconstititional character of a particular tax by claiming that its remote effect will be to impair the borrowing power of the government, courts in overturning statutes, long established and within the ordinary sphere of state legislation, ought to have something more substantial to act upon than mere conjecture. The injury ought to be obvious and appreciable." *Plummer* v. *Coler*, 178 U. S. 115, 137–138 (1900).

The proposition that a federal guarantee of a loan does not preclude state taxation is a "long established" one. See *Board of Comm'rs of Montgomery County* v. *Elston*, 32 Ind. 27, 32 (1869); *S.S. Silberblatt, Inc.* v. *Tax Comm'n of New York*, 5 N. Y. 2d 635, 641, 159 N. E. 2d 195, 197–198, cert. denied, 361 U. S. 912 (1959); see also 47 Op. N. C. Atty. Gen. 19 (1977) (concluding that Ginnie Maes are not "obligation of the United States" for these purposes, and indicating that the Assistant Director of GNMA agreed with this position). In fact, during the debate on one of the predecessors to the current immunity statute, Senator Sherman assured the Senate that bonds of the Pacific Railroad, which had been guaranteed by the United States, were not subject to immunity. See Cong. Globe, 41st Cong., 2d Sess., 1591 (1870), discussing Act of July 14, 1870, 16 Stat. 272.

*ings Society* v. *San Francisco*, 200 U. S. 310, 315 (1906); *Plummer* v. *Coler*, 178 U. S. 115, 136 (1900). Moreover, none of the proceeds of the issuance and sale of the GNMA certificates are received by the Federal Government or used to finance any governmental function. Indeed, given the fixed fees that GNMA charges issuers, and the lack of any GNMA profit sharing, it has not been suggested here that the federal fisc would at all benefit from a holding that Ginnie Maes are exempt from state taxation.[11]

Appellant asserts that Congress authorized the GNMA's guarantee for the salutary purpose of facilitating the financing of private mortgages, and that an exemption from state taxation will further this purpose. But our job is neither to assess the underlying merits of the program, nor to opine on whether Congress would be wise to exempt Ginnie Maes from state taxation. Our task is simply to decide whether the indirect, contingent, and unliquidated promise that GNMA is authorized to make is the type of federal obligation for which the Constitution, in Congress' silence, imposes an exemption from state taxation. We hold that it is not.

## III

A court must proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly established. We do well to remember the concluding words in *Smith*, which although spoken in reference to the statute, are relevant to our role in applying the constitutional doctrine as well:

> "All of these related statutes are a clear indication of an intent to immunize from state taxation only the

---

[11] Even if there were a somewhat more certain effect, state taxation of these privately issued instruments would not necessarily be invalid. See *Alabama* v. *King & Boozer*, 314 U. S. 1 (1941); *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466 (1939); *James* v. *Dravo Contracting Co.*, 302 U. S. 134 (1937). Immunity from taxation "may not be conferred simply because the tax has an effect on the United States." *United States* v. *New Mexico*, 455 U. S. 720, 734 (1982).

interest-bearing obligations of the United States which are needed to secure credit to carry on the necessary functions of government. That intent, which is largely codified in § 3701, should not be expanded or modified in any degree by the judiciary." 323 U. S., at 119.

The judgment is

*Affirmed.*